**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| JARVIS GRINDSTAFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-2373 (ABJ) |
| | ) | |
| UNITED STATES SMALL | ) | |
| BUSINESS ADMINISTRATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Jarvis Grindstaff brought this action against his former employer, the United States Small Business Administration ("SBA"), and Kelly Loeffler, in her official capacity as the Administrator of the Small Business Administration.[1]  Compl. [Dkt. # 1].  Grindstaff is fully deaf, and he alleges that during his employment, the agency refused to provide him with reasonable accommodations for his disability; treated him differently from non-disabled employees; created a hostile work environment; and retaliated against him for engaging in protected activity.  Compl. ¶¶ 2, 11.  He brought five claims against defendants under section 501 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 791 *et seq*.  Compl. ¶¶ 1, 45–54.

Plaintiff filed the complaint on September 8, 2021.  *See* Compl.  On January 17, 2022, defendants moved to dismiss the complaint in part on grounds that it failed to state disparate treatment, retaliation, and hostile work environment claims.  Mot. to Dismiss [Dkt. # 10] at 1–2. The Court denied the motion for the reasons set forth on the record at a hearing on October 26, 2022.  Minute Entry (Oct. 26, 2022).  Defendants answered the complaint on January 3, 2023,

---

1    Defendant Loeffler is substituted automatically as a defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

Answer [Dkt. # 16], and the parties engaged in both settlement negotiations and discovery. Initial Scheduling Order [Dkt. # 18].

On December 18, 2023, the parties filed a joint status report informing the Court that they had been unable to reach a settlement, and they proposed a schedule for briefing summary judgment motions. Joint Status Report [Dkt. # 23]; Minute Order (Dec. 21, 2023).

Pending before the Court are defendants' motion for summary judgment and plaintiff's cross-motion for partial summary judgment. Defs.' Mot. for Summ. J. [Dkt. # 25] ("Defs.' Mot."); Pl.'s Opp. to Defs.' Mot. & Cross-Mot. for Partial Summ. J. [Dkt. # 28] ("Pl.'s Cross-Mot."). The motions are fully briefed. Defs.' Reply in Further Supp. of Defs.' Mot. [Dkt. # 30] ("Defs.' Reply"); Pl.'s Reply Mem. in Further Supp. of Pl.'s Cross-Mot. as to Claim II of the Compl. [Dkt. # 32] ("Pl.'s Reply").

For the reasons stated below, defendants' motion will be **GRANTED IN PART AND DENIED IN PART**, and plaintiff's cross-motion will be **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

Plaintiff joined the Small Business Administration on June 1, 2015 as an Economic Development Specialist for the Office of Field Operations in Washington, D.C. Defs.' Statement of Undisputed Material Facts [Dkt. # 25-2] ("DSUMF") ¶¶ 1, 3; Pl.'s Statement of Undisputed Material Fact [Dkt. # 28-3] ("PSUMF") ¶¶ 1–2. His main responsibilities were to support agency outreach efforts to disabled individuals by helping them understand the policies and processes available to start a business and obtain financial aid, and to respond to questions from clients and consumers. DSUMF ¶ 5; Pl.'s Opp. to DSUMF [Dkt. # 28-2] ("PODSUMF") ¶ 5. As a new employee, plaintiff was on a two-year probationary period that required him to show his "fitness

or qualifications for continued employment." DSUMF ¶ 4, quoting Ex. A to Defs.' Mot [Dkt. # 25-3] ("Termination Letter") at 1; PODSUMF ¶ 4.

Plaintiff is completely deaf, and he is able to use American Sign Language ("ASL") but unable to read lips. PSUMF ¶¶ 3–4, 9; Defs.' Opp. to PSUMF [Dkt. # 30-1] ("DOPSUMF") ¶¶ 3–4. The Administration was aware of his deafness when it hired him, and it knew that plaintiff would need accommodations to perform his job. DSUMF ¶ 2; PSUMF ¶¶ 5–6. During plaintiff's time at the agency, Gaye Walker was the Reasonable Accommodation Coordinator and Acting Disability Employment Program Manager responsible for processing plaintiff's accommodation requests. DSUMF ¶ 7; PSUMF ¶¶ 10, 53; DOPSUMF ¶ 10.

Plaintiff requested reasonable accommodations for his deafness when his employment began, and the agency provided accommodations from the day he arrived. PSUMF ¶¶ 7, 18; DOPSUMF ¶¶ 7, 18; DSUMF ¶ 8; PODSUMF ¶ 8. It hired a full-time ASL interpreter named Barry Samuels, who facilitated communication between plaintiff and non-deaf individuals through sign language. DSUMF ¶¶ 9–10, 14; PSUMF ¶¶ 7, 13–14. For communicating with deaf individuals, which was a part of his duties, plaintiff was provided with a device that acted as a "videophone-to-videophone call where [he could] see the deaf caller via the video screen." Aff. of Jarvis Grindstaff, Ex. 1 to Pl.'s Cross-Mot. [Dkt. # 28-1] ("Grindstaff Aff.") ¶¶ 20–22; PSUMF ¶¶ 7, 11; DOPSUMF ¶¶ 7, 11. And the agency provided plaintiff with an "UbiDuo machine," which enabled him to communicate face-to-face with other employees, deaf or non-deaf, through a typing interphase without the use of ASL or an interpreter. PSUMF ¶ 7; DSUMF ¶¶ 26–27. In addition, the agency also provided plaintiff with a cellphone, and a laptop with email. DSUMF ¶¶ 32, 36; PODSUMF ¶¶ 32, 36.

For the first portion of plaintiff's employment, his supervisor was Eugene Cornelius, who identified no performance issues on plaintiff's part.  PSUMF ¶ 8; DSUMF ¶ 38; Grindstaff Aff. ¶ 9.  In January 2016, though, Steve Dixel replaced Cornelius as plaintiff's supervisor,  DSUMF ¶ 6; PSUMF ¶ 9; Decl. of Barry Samuels, Ex. 7 to Pl.'s Cross-Mot. [Dkt. # 28-1] ("Samuels Decl.") ¶ 17, and after the switch, plaintiff's relationship with the agency declined until his eventual termination in November 2016.

The facts surrounding the termination are largely undisputed.  The termination letter issued by the agency predicates the disciplinary action on a series of unexcused absences in October 2016.  Termination Letter at 1.

The first absence occurred on October 3, 2016, when plaintiff "left work during his duty hours to go to the gym" in the SBA's office building.  DSUMF ¶ 40; PODSUMF ¶ 40.  Plaintiff admitted that this was not the first time he had gone to the gym during duty hours, and that he thought he was allowed to do so without taking leave.  DSUMF ¶¶ 41, 44; PODSUMF ¶¶ 41, 44; PSUMF ¶ 61.  The following day, Dixel told plaintiff that he was not allowed to go to the gym during duty hours, and that he had to submit a leave request for the hour he was at the gym on October 3.  DSUMF ¶ 42; PODSUMF ¶ 42.

The second absence occurred the next day: October 4, 2016.  Plaintiff was scheduled to telework that day, but in the morning, he emailed Dixel to say that there was a problem with his laptop.  DSUMF ¶¶ 45–46; PODSUMF ¶¶ 45–46.  Dixel told him report to the office since he was having technical issues, and he directed plaintiff to keep his scheduled appointments that day.  DSUMF ¶¶ 47–48; PODSUMF ¶¶ 47–48.  Plaintiff did not go into the office, and he also missed a video call scheduled for that afternoon after attempting to cancel it at the last minute because "something" came up that needed his "urgent attention."  DSUMF ¶¶ 49–51, quoting Dep. of Jarvis

Grindstaff, Ex. B to Defs.' Mot. [Dkt. # 25-4] ("Grindstaff Dep.") at 95:6–11; PODSUMF ¶¶ 49–51. The "something" was that plaintiff had to leave early to make a flight to Japan because the ride he had previously set up to take him to the airport fell through. DSUMF ¶ 52; PODSUMF ¶ 52. Dixel told Grindstaff that he would have to submit a leave request for October 4. DSUMF ¶ 53.

The third absence was on October 11, 2016, when again, plaintiff was scheduled to telework. DSUMF ¶¶ 55, 57; PODSUMF ¶¶ 55, 57. Plaintiff had planned to fly to Tokyo for a week, fly back and telework on October 11, and then take three more days of leave before returning to work on October 17. DSUMF ¶ 56; PODSUMF ¶ 56. But Dixel emailed plaintiff three times on October 11 to schedule video calls, and plaintiff failed to respond to any of the requests. DSUMF ¶ 58; PODSUMF ¶ 58.

Grindstaff submitted leave requests for all three of the absences when he returned to work on October 17. DSUMF ¶¶ 43, 54, 59; PODSUMF ¶¶ 43, 54, 59; Ex. G to Defs.' Mot. [Dkt. # 25-9] ("Leave Slips") at USA-GRINDSTAFF-00161–63. Dixel met with plaintiff and his interpreter that day to present him with a written questionnaire that the parties describe as "an opportunity to explain the absences." DSUMF ¶ 61; PODSUMF ¶ 61. Dixel told plaintiff to answer the questions promptly, and when plaintiff had not responded by mid-day on October 18, Dixel told him to respond by the end of the day. DSUMF ¶¶ 62–65; PODSUMF ¶¶ 62–65. Plaintiff filled out the form, but his answers were largely non-responsive or incomplete. *See* Ex. H to Defs.' Mot. [Dkt. # 25-10] ("Grindstaff Questionnaire") at 1–3. For example, he responded "n/a" to the question "Did you have permission from [Dixel] to go to the Gym during duty hours?" *Id.* at 1. He also responded "n/a" to "Have you always reported your time and attendance truthfully? (GYM and Fitness activities)." *Id.* For the question, "Did you discuss the one hour exercise rule with

any colleagues or in your chain of command at SBA? Please explain fully," he responded, "Talk to Eugene." *Id.* And to the question that asked "What 'came up' that required your urgent attention on [October 4]," the day he attempted to cancel a meeting at the last minute, he wrote, "My friend needed my urgent help." *Id.* at 2.

Plaintiff claims that he told Dixel that he did not understand many of the questions and that he wanted to meet with Dixel again to discuss them. PODSUMF ¶¶ 65–66; PSUMF ¶ 65. But Dixel and plaintiff did not meet again, and Dixel disapproved each of the leave slips on October 18, noting that plaintiff failed to provide advanced notice for any of the absences. Leave Slips at USA-GRINDSTAFF-00161–63. The same day, Dixel also informed Grindstaff that he was going to be charged with fourteen-and-a-half hours of absent without leave ("AWOL") time. DSUMF ¶ 64; PODSUMF ¶ 64.

On October 19, 2021, plaintiff told Dixel that he felt discriminated against and that he was going to file a complaint with the Equal Employment Office ("EEO"). PSUMF ¶ 47; DOPSUMF ¶ 47. The next day, Walker emailed plaintiff acknowledging that she was aware that he wanted to file an EEO complaint, and she directed, "[i]f you believe you have been discriminated against at any point in this process, I have attached your rights in the EEO process. You will need to contact Harriet Tyler . . . to be assigned an EEO Counselor." Emails, Ex. 6 to Pl.'s Cross-Mot. [Dkt. # 28-1] ("Emails") at 22; PSUMF ¶ 48; DOPSUMF ¶ 48. Plaintiff contacted the EEO office on October 20, alleging that Dixel harassed him because of his deafness. PSUMF ¶ 49; DOPSUMF ¶ 49.

Grindstaff was formally charged with AWOL on October 27, 2016. DSUMF ¶ 74; PODSUMF ¶ 74. On November 18, 2016, he was issued a Notice of Termination based on his "14.5 hours of Absence without Leave," and the "untimely, incomplete, and inappropriate

responses to [Dixel's] written questions."  Termination Letter at 1; DSUMF ¶¶ 75–76; PSUMF ¶ 52.

Plaintiff filed a formal EEO complaint on November 30, 2016, alleging:

> Complainant was subjected to harassment that created a hostile work environment and discriminated against on the bases of disability (Hearing Impaired), and reprisal (EEO activity) when:
>
> 1) On July 23, 2016, Complainant's Reasonable Accommodation request to order new videophone equipment was denied.
>
> 2) On August 11, 2016, August 24, 2016, August 29, 2016, September 8, 2016, and October 27, 2016, Complainant's work equipment was not working.
>
> 3) On October 17, 2016, management refused to accept Complainant's three leave slips for October 3, 4, and 11, 2016.
>
> 4) On October 19, 2016, Complainant's request for an interpreter was ignored.
>
> 5) On October 19, 2016, Complainant's request for administrative leave was denied.
>
> 6) On October 27, 2016, Complainant was told that his request(s) for Reasonable Accommodation resulted in people not liking him.
>
> 7) On October 27, 2016, management made a final decision to charge Complainant with Absent Without Official Leave.
>
> 8) On November 18, 2016, Complainant was issued a Notice of Termination for Unacceptable Conduct.
>
> 9) Management refused to promote Complainant to a GS-9.
>
> 10) Management terminated his employment.

Compl. ¶ 42; PSUMF ¶ 68; DOPSUMF ¶ 68.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

7

56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

**ANALYSIS**

The Rehabilitation Act "governs employee claims of handicap discrimination against the Federal Government."  *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993).  It provides that "[n]o otherwise qualified individual with a disability" shall be discriminated against by a federal agency "solely by reason of her or his disability," 29 U.S.C. § 794(a), and it expressly incorporates the standards applied under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq*. 29 U.S.C. § 794(d).

Through the ADA, the Rehabilitation Act requires federal employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); *see Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (explaining the Rehabilitation Act's anti-discrimination provisions by way of the ADA).  It also forbids retaliation "against any individual because such individual has opposed any act or practice made unlawful by [the statute] or because such individual made a charge . . . under [the statute]." *Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014), quoting 42 U.S.C. § 12203(a).  Some plaintiffs have brought hostile work environment claims against their employers under the ADA and Rehabilitation Act, *see Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) (upholding the trial court's decision to grant summary judgment to an employer because the plaintiff failed to meet the test set out in *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)), but the D.C. Circuit had not yet dealt with whether hostile work environment claims are available under the ADA.

The complaint consists of five claims:  Count One alleges discrimination, that is, defendants treated plaintiff less favorably than non-disabled employees; Count Two alleges that defendants denied plaintiff reasonable accommodations for his disability; Counts Three and Four

9

allege that defendants subjected plaintiff to a discriminatory and retaliatory hostile work environment; and Count Five alleges that defendants retaliated against plaintiff for exercising his employment rights. Compl. ¶¶ 45–54. Defendants moved for summary judgment on all counts, and plaintiff opposed the motion and cross-moved for summary judgment on Count Two. Defs.' Mot. at 1; Pl.'s Cross-Mot. at 1.

The facts surrounding plaintiff's allegations of discrimination, retaliation, and hostile work environment will be discussed more thoroughly in connection with the Court's analysis of each claim.

**I.      The Court will not grant defendants summary judgment on Count One because there is a genuine dispute of material fact as to whether the agency subjected plaintiff to disparate treatment over his use of the gym and its discriminatory intent.**

Defendants move for summary judgment on the disparate treatment claim, arguing that plaintiff failed to "identify any comparators or even instances in which he was treated less favorably than non-disabled coworkers." Defs.' Reply at 2.

The "two essential elements" that plaintiff must establish for a disability discrimination claim under the Rehabilitation Act "are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . disability." *Baloch*, 550 F.3d at 1196. Plaintiff "may always prove a claim of discrimination by introducing direct evidence of discriminatory intent" on the part of the employer. *McGill v. Muñoz*, 203 F.3d 843, 845 (D.C. Cir. 2000). But if he lacks direct evidence of discriminatory intent, plaintiff can also sustain the claim under a "disparate treatment" theory by offering evidence he was treated unfavorably compared to other similarly situated employees. *Id.* at 846–47.

Plaintiff argues that a question of fact exists as to why the agency marked him "AWOL and terminated for going to the gym" during duty hours when two non-disabled employees, Dixel

and Samuels, "stated that they also went to the gym but were not marked AWOL or terminated."

Pl.'s Reply at 14, citing Grindstaff Aff. ¶¶ 40–44, Dep. of Steve Dixel, Ex. 3 to Pl.'s Cross-Mot.

[Dkt. # 28-1] ("Dixel Dep.") at 125–26, and Samuels Decl. at 7–9.  He also cites a portion of his

own affidavit:

> I was fired for going to the gym during lunch, but everyone in our office
> went to the gym.  The gym was in our building.  Mr. Samuels went to the
> gym.   Mr. Dixel went to the gym.   Nondisabled employees were not
> disciplined for going to the gym.  I[n] fact, we were all encouraged to go to
> the gym.  We received emails from the Obama administration and the SBA
> administrator encouraging us to the go to the gym.

Grindstaff Aff. ¶ 39.

Dixel's deposition does not advance plaintiff's claim.  He stated that he used the gym in

the SBA's office building, that he thought federal employees were permitted to use the gym, and

that he did not know whether employees were permitted to use the gym during work hours.  Dixel

Dep. at 125:18–126:6.  He did not say that he, or any other employee, used the gym during their

duty hours.  *See id.* at 127:5–7 ("Q. Well, you were supposed to be in your work area but you went

to the gym, correct?  A. No.").

However, Samuels stated,

> Everyone in the agency went to the gym, and at all hours.  I went to the
> gym.  The policy in the office was that it was acceptable to go to the gym.
> The gym was in the building. . . . Non-disabled employees, and those who
> did not request accommodation, were not fired for going to the gym.

Samuels Decl. ¶ 45.

And Samuels further stated that "both Ms. Walker and Mr. Dixel had resentment toward

Mr. Grindstaff," "Mr. Dixel told me that the requests for accommodations were 'annoying,'" and

"Mr. Dixel told Mr. Grindstaff that his requests for reasonable accommodation 'resulted in people

not liking him.'"  Samuels Decl. ¶¶ 50–51.  Defendants deny all of these assertions, DOPSUMF

11

¶¶ 50, 62, 67, but Samuels's declaration gives rise to a genuine dispute of material fact as to whether the agency subjected plaintiff to disparate treatment by punishing him for going to the gym during work hours, and whether it had a discriminatory intent in doing so.

Given that plaintiff has identified portions of the record raising a genuine dispute, the Court will not grant summary judgment to defendants on Count One.

**II.    The Court will grant summary judgment in plaintiff's favor on the failure to accommodate claim in Count Two because there is no dispute that defendants did not provide him with a working videophone prior to his termination from the agency.**

Both parties move for summary judgment on plaintiff's claim that defendants failed to provide reasonable accommodation for his disability. Defs.' Mot. at 7; Pl.'s Cross-Mot. at 8; Compl. ¶¶ 47–48.

It is a "basic tenet" of the Rehabilitation Act "that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." *Barth*, 2 F.3d at 1183. To survive summary judgment on a failure to accommodate claim, plaintiff must come forward with sufficient evidence to allow a reasonable jury to conclude that (1) he was disabled within the meaning of the Rehabilitation Act; (2) his employer had notice of his disability; (3) he was able to perform the essential functions of his job with or without reasonable accommodation; and (4) his employer denied his request for a reasonable accommodation of that disability. *Doak v. Johnson*, 798 F.3d 1096, 1105 (D.C. Cir. 2015), citing *Solomon*, 763 F.3d at 9. And to prevail on his motion for summary judgment, plaintiff must "show[] that there is no genuine dispute as to any material fact" as to any of the four elements, and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Hill*, 897 F.3d at 237.

An accommodation is "reasonable" if it enables the employee to fulfill all essential functions of his job. *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007); *see* 29 C.F.R.

12

§ 1630.2(o)(1)(ii) (defining reasonable accommodation as a "[m]odification[] or adjustment[] to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable[s] an individual with a disability who is qualified to perform the essential functions of that position"). Reasonable accommodations may include "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities." *Id.* § 1630.2(o)(2)(ii); *see also* 42 U.S.C. § 12111(9)(B).

To demonstrate that an employer denied a request for accommodation, the plaintiff must show the employer ended or was a bad-faith participant in the "interactive process." *Hartzler v. Mayorkas*, No. 22-5310, 2024 WL 3219489, at *1 (D.C. Cir. June 28, 2024), quoting *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014). "Because an appropriate accommodation will often turn on specific facts concerning the employee's disability and the employer's workplace, the employee and employer frequently need to share information to find a workable solution." *Ali v. Regan*, 111 F.4th 1264, 1269 (D.C. Cir. 2024). The Court of Appeals has "described this 'interactive process' as 'a flexible give-and-take between employer and employee so that together they can determine what accommodation would enable the employee to continue working.'" *Id.*, quoting *Ward*, 762 F.3d at 32 (internal quotation marks omitted). "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Ward*, 762 F.3d at 32 (internal quotation marks omitted). Therefore,

> courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A

> party that fails to communicate, by way of initiation or response, may also be acting in bad faith.  In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id.*, quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005).

Here, there is no dispute as to the first three elements of the reasonable accommodation claim: plaintiff was disabled as a fully deaf individual, the agency had notice of his deafness throughout his hiring and employment, and he was able to perform the essential functions of his job with or without reasonable accommodation.  PSUMF ¶ 8; DOPSUMF ¶ 8; DSUMF ¶¶ 2, 8, 13; PODSUMF ¶¶ 2, 8, 13.   And plaintiff agrees that the SBA provided him reasonable accommodation for his deafness during the first portion of his employment when Cornelius was his supervisor.  Pl.'s Cross-Mot. at 2; PSUMF ¶ 8.

Plaintiff claims that the agency "stopped providing accommodation in July 2016, after Dixel became his supervisor," and specifically that he was denied: a videophone from July 20, 2016 to his termination on November 18, 2016, an ASL interpreter from October 19 through October 21, 2016, and an UbiDuo machine from October 19 to his termination.  Pl.'s Cross-Mot. at 10–29.

The parties agree that plaintiff faced technical issues with his videophone that would cause his service to be interrupted.  DSUMF ¶ 16; PSUMF ¶ 23.  On July 20, 2016, he emailed Walker and Dixel to express his frustration with the accommodation.  PSUMF ¶ 25, citing Emails at 1–2; DOPSUMF ¶ 25.  He wrote, "The current videophone at my office is software app which I noticed the computer's performance . . . and internet speed have big impact to the quality of videophone. Often time the phone call has disconnect or the video is very blurry due to the computer or internet is very slow."  Emails at 1.  He stated that a "hardware videophone" would solve the technical issues, and he recommended two types of videophones.  *Id.*  Walker responded the same day

14

acknowledging plaintiff's request, and she asked him to tell the hardware videophone salesperson to contact her. *Id.*

In the meantime, plaintiff continued to have technical issues. On August 11, he submitted a ticket to the agency's Information Technology ("IT") services stating, "Letting you know that I couldn't use videophone today. I am supposed to talk to two deaf clients today but I have to cancel my appointments today because of videophone isn't working today. I hope you can fix it soon." *Id.* at 4. He notified both Walker and Dixel of the ticket as well. *Id.* And on August 12, he sent another email to Walker and Dixel letting them know that his "videophone [was] still down." *Id.* at 5.

On August 15, 2016, plaintiff and Walker exchanged more emails regarding the videophone situation. *Id.* at 7–9. After plaintiff inquired about the status of a new videophone, Walker responded:

> I have done my research and the problem with the videophone is not the phone, it is the network capability. This agency does not have the bandwidth to support those two phones that you proposed this agency purchase. You will have the same problem with any videophone that you use. From what I understand, IT is working with you now and it is a connectivity problem with AT&T, not the phone so at this time, I will not be purchasing you a new phone. Please let me know if you have any questions. Thank you.

*Id.* at 9. Plaintiff responded, "It's not about bandwidth issue. It's all about my office computer's performance (CPU processor and RAM memory) is not able to handle well with videophone software well . . . . Hardware videophone will be a solution because it won't touch computer." *Id.* at 8. He also wrote, "I use videophone every day to call to district offices, regional office, co-workers, deaf clients, and more. I want my videophone works well exactly as regular phone in your office." *Id.* at 9.

15

Walker responded that her understanding of the technical issues with the videophone software was based "on the response [she] received from OCIO . . .  Their response is as follows: 'The issue has always been with bandwidth.  We have been manually making it work.'"  *Id.* at 8. She also wrote, "I am here to support you in any way that I can but what I can't do is spend government funds on something that we know (based on the experts, OCIO) will not work."  *Id.* at 9.  Plaintiff then asked her to clarify:  "You are saying that your office couldn't approve my request to install new videophone at my office.  Am I right?"  *Id.* at 7.  And she responded,

> I am not stating that I cannot approve your request for installation of a new videophone.  What I am stating is that until OCIO can tell me what the best solution is for the problems with the videophone, whether it is bandwidth, network connections, etc., I will not spend money on a product/service, or installation that will not benefit you in performing your job.

*Id.* at 7.

After additional investigation, the SBA ultimately purchased a hardware videophone for plaintiff, which he received on September 8, 2016, although it was not installed at that point. DSUMF ¶¶ 24–25, citing October 27, 2016 Email, Ex. F to Defs.' Mot. [Dkt. # 25-8] at 1; PSUMF ¶ 30; DOPSUMF ¶ 30.

Shortly thereafter, plaintiff also experienced problems when his interpreter was unavailable.  On October 17, 2016, plaintiff learned that Samuels, his ASL interpreter, would be on leave from October 19 through October 21, 2016.  PSUMF ¶ 32, citing Grindstaff Aff. ¶ 30(z); DOPSUMF ¶ 32.  On October 19, plaintiff notified Walker and requested a replacement interpreter, but she told him that it was too last minute to get a replacement.  DSUMF ¶¶ 69–70, citing Grindstaff Dep. at 72:19–24, 73:5–8; PODSUMF ¶¶ 69–70; PSUMF ¶ 33; DOPSUMF ¶ 33.

Plaintiff then attempted to take administrative leave.  At 11:41 a.m. on October 19, he emailed Dixel, "I just realize that I should be on administrative leave because whole of opinions

16

for my reason accommodation are ran out which I am not able to perform full function at my workplace." Emails at 16; DSUMF ¶ 71; PODSUMF ¶ 71. Dixel responded, "You will not be granted administrative leave. I have duties you can perform outside of your accommodations. The only other option you have is to take annual leave, which I will grant." Emails at 16. Plaintiff replied, "But I want to talk to you in person to follow up several old business and several serious topics. Our in person meeting is part of our daily schedule at workplace and regular tasks. How does it possible?" *Id.* Dixel answered, "[W]e have a weekly meeting, not a daily. From what I understand you have a UBIDO where we can meet face to face if it is a must." *Id.* To which plaintiff responded, "It's called UbiDuo and it will not help me make a phone calls and use my sign language to communicate in person. UbiDuo is not a solution for my reason accommodation. But I will accept and respect your decision." *Id.*

Plaintiff emailed Walker at 1:27 p.m. that day to share his concerns about his "limitation function at workplace." *Id.* at 32. He explained:

> Since the ASL interpreter is not available and videophone is not working which I realize that my function is very limitation and all of my reasonable accommodations are ran out. I don't really feel comfortable to discuss with my supervisor about complex tasks without an ASL interpreter. Also the guy came to my office to try fix videophone software which I also don't have an access to my computer for several times. Also I couldn't make any phone calls or discuss in complex topic with UbiDuo or paper/pen. So I requested my supervisor for an administration leave until videophone is working or better solution for my reasonable accommodation. My supervisor couldn't honor my request. So what is your suggestion on this?

*Id.*; PSUMF ¶ 43; DOPSUMF ¶ 43. Walker responded the next day:

> Your management team reached out to this office for advice and guidance in regards to your request for administrative leave due to your interpreter not being available and your videophone not working. I advised . . . that granting administrative leave because your equipment does not work i[s] not a reasonable accommodation. From what I understand, your supervisor provided you with the option of taking leave for the day and also provided you assignments in writing to work on if you choose not to take leave. You

17

> also have in place an UbiDuo that allows you face-to-face communication with others.

Emails at 31.  Plaintiff responded, "For your information that UbiDuo is also not working too," and he explained, "I cancelled several appointments this week because all of my reasonable accommodation options are ran out.  I couldn't discuss with my supervisor about some questions with task that he gave on Wednesday because of all my reasonable accommodations are not available."  *Id.* at 27.  Walker responded:

> While the videophone was down, you[] were provided with two options, either take leave or work on a project that your supervisor presented to you while the videophone problems were being resolved. . . .
>
> In speaking with your supervisor, I was informed that the UbiDuo was stored in your cabinet and needed to be charged.  It is your responsibility to keep this form of communication in operational mode.  It is also your responsibility to inform your supervisor or this office if the UbiDuo is inoperable.  We have a backup that you could have used until the one assigned to you was fully charged or repaired if necessary.  The Agency also has Lync in which you could have used to communicate with your supervisor. . . .
>
> From what I understand, you communicated with your supervisor through email throughout the day. . . .

*Id.* at 27–28.  On October 21, plaintiff replied:

> Steve gave me a task but there are some unsure and require me to ask him to ensure that i doing right way.  Normally I always stop by his office to ask some questions relate to written tasks but I couldn't do that because ASL interpreter and videophone isn't working.  Now I am afraid that I will get low performance result because of lack of understand with the tasks. . . .
>
> That's false information.  The UbiDuo was 1/2 charged which it's enough to operate all day.  The connective issue has nothing do with battery life.  It's same concept as iPhone's half battery life and iphone supposed to be still working well.  I don't have an access to Lyft as well because Outlook and Lyft on my computer are down.

*Id.* at 26.  Samuels, the interpreter, returned from leave on October 22.  DSUMF ¶¶ 67–68, citing Grindstaff Dep. at 65:19–23, 67:9–13.

Finally, on October 27, plaintiff emailed Walker and Dixel to follow up on the installation of the new hardware videophone. Emails at 45. He wrote:

> Since my current videophone isn't working this morning. I think it's time to start use new videophone. The new videophone has been sitting on my desk since 9/8 but I am still not able to use it. So I would like to know when will ITSC complete the installation part for new videophone and ready to use it?

*Id.* The hardware videophone that the agency bought was not installed until after plaintiff's termination. PSUMF ¶ 30; DOPSUMF ¶ 30.

Plaintiff's failure to accommodate claim embraces all three of his individual accommodations – the videophone, the ASL interpreter, and the UbiDuo machine. Pl.'s Cross-Mot. at 11–29. While the facts surrounding the interpreter and the UbiDuo machine are not sufficient to raise a genuine issue of material fact as to whether the agency failed to accommodate plaintiff, the undisputed facts surrounding the videophone support plaintiff's claim.

First, as to the ASL interpreter, the undisputed facts show that plaintiff learned on October 17 that Samuels would be on leave from October 19 through 21; he did not inform Walker that he needed a replacement interpreter until October 19; and Walker responded that it was too last minute to get an interpreter. PSUMF ¶¶ 32–33; DOPSUMF ¶¶ 32–33; DSUMF ¶¶ 69–70, citing Grindstaff Dep. at 72:19–24, 73:5–8; PODSUMF ¶¶ 69–70. Those facts do not support a triable claim that the agency denied plaintiff an interpreter or otherwise refused to make an accommodation for him. The agency hired Samuels to assist plaintiff in the first place, and a three-day period of absence for which the agency had no notice does not constitute a refusal to provide accommodation. Even plaintiff acknowledges that "[t]he only accommodation that consistently

worked during the July 23, 2016, to November 18, 2016, time period was the interpretive services provided by ASL interpreter Barry Samuels." Pl.'s Cross-Mot. at 20.[2]

With respect to the UbiDuo, the parties dispute whether the communication device was unavailable in the first place, with plaintiff asserting that it was broken and defendants arguing that plaintiff failed to keep it charged. PSUMF ¶¶ 43–44; DSUMF ¶ 31. Regardless, the emails offered by plaintiff do not raise an inference that the agency refused to accommodate through the UbiDuo or otherwise ended the interactive process regarding the device. In fact, when plaintiff alerted Walker that the UbiDuo was not working, she responded, "[w]e have a backup that you could have used until the one assigned to you was fully charged or repaired if necessary." Emails at 27. Considering that plaintiff has not put forth any evidence that he acknowledged or followed up on

---

2       Plaintiff attempts to identify a factual dispute by pointing to portions of the record that he maintains show that the agency could have, but failed to cover the interpretive service for the days Samuels was on leave. He argues that Walker did not actually look for a replacement interpreter and instead told him that he had to find his own. Pl.'s Cross-Mot. at 21–22, citing Emails at 21. The email he cites from Walker does state, "when you became aware of Mr. Samuels['s] leave request, it was your responsibility to secure a backup interpreter as you have in the past. I have attached that form for your use in the future," Emails at 21, but in her deposition, Walker clarified that plaintiff's duty was to "request" a substitute interpreter, "[n]ot to find one." DOPSUMF ¶ 41; Walker Dep. at 57:14–20. And she further explained in her deposition that when her office was informed that Samuels was on leave, either she or someone on her staff attempted to secure a replacement, although she could not remember who had done so. Walker Dep. at 58:22–60:10.

Plaintiff also argues that the agency actually had enough advance notice of Samuels's leave, pointing to a paragraph of Samuels's declaration: "Mr. Dixel and Ms. Walker stated that they were not aware of my leave until a few days before I took leave, but that is not true. I gave them at least two weeks' notice." Pl.'s Cross-Mot. at 22, citing Samuels Decl. ¶ 33. This does set up a dispute between Samuels and plaintiff's supervisors, but plaintiff has agreed to defendants' statement of undisputed fact that he did not provide notice of the need for a replacement until the day Samuels left. DSUMF ¶ 69; PODSUMF ¶ 69. This seems to make the Samuels declaration, which does not point to any record memorializing the notification, inadequate to support plaintiff's claim by itself. But the Court will enter judgment in plaintiff's favor on the denial of accommodation claim in Count Two on other grounds, so it need not resolve this issue.

the agency's offer, the Court cannot say that a reasonable jury would find that the agency refused to accommodate plaintiff's request for an UbiDuo.

The only thing plaintiff does point to is Walker's deposition statement that, "[F]rom what I recall, Steve Dixel found a broken UbiDuo in his bottom drawer." Dep. of Gaye Walker, Ex. 4 to Pl.'s Cross-Mot. [Dkt. # 28-4] ("Walker Dep.") at 41:17–19; *see id.* at 52:14–16 ("As I said previously, I believe I found out the UbiDuo wasn't working when Steve Dixel found it in his bottom drawer."). But that does not serve as factual support that the agency refused to accommodate him; again, the emails show that Walker notified plaintiff that there was a substitute UbiDuo, and there is no evidence that he took her up on that offer or tried to work with the agency to get a working machine.

Plaintiff's failure to accommodate claim does prevail on the facts surrounding the videophone. The email communications between the parties show that plaintiff's software videophone suffered from technical issues that would cause service interruptions; plaintiff put the agency on notice of the technical problems several times; after a period of discussion, the agency bought plaintiff a hardware videophone to mitigate the issue; and although plaintiff received the hardware videophone by September 8, 2016, the agency did not actually install it until after he was terminated on November 18, 2016.

Plaintiff has also put forth facts in the record to support his assertion that he could not perform his essential duties without the videophone. PSUMF ¶¶ 24, 31. The parties agree that his responsibilities at the SBA involved conducting outreach to disabled individuals to market the agency's various resources and programs. DSUMF ¶ 5, citing Grindstaff Dep. at 13:3–14:5 and Ex. C to Defs.' Mot. [Dkt. # 25-5] ("Job Description") at 1; PODSUMF ¶ 5. Plaintiff further averred that the videophone was "crucial for making phone calls to clients, district directors,

regional administrators, and others" by facilitating "both direct communication with deaf and hard of hearing individuals who also use videophones, and indirect communication through Relay services." Grindstaff Aff. ¶ 10. And one of the emails plaintiff sent to the agency's IT services showed the effect of not having access to the videophone: "Letting you know that I couldn't use videophone today. I am supposed to talk to two deaf clients today but I have to cancel my appointments today because of videophone isn't working today. I hope you can fix it soon." Emails at 4.

Defendants responds that "the videophone was never [plaintiff's] sole accommodation," and that his UbiDuo, interpreter, and email were available throughout most of the period between July and November 2016. Defs.' Mot. at 9; Defs.' Reply at 4. But their summary statements that plaintiff "was able to perform the essential elements of his job when communicating via text and email," DSUMF ¶¶ 35, 37, are not enough to defeat plaintiff's motion for summary judgment. On plaintiff's motion, defendants have the obligation of identifying a genuine dispute of material fact as to whether it properly accommodated plaintiff even without the videophone, and it has not explained at all how plaintiff was supposed to manage his duty of outreach without a piece of equipment that would enable him to host meetings.

Defendants also argue that the accommodation was merely "delay[ed] a few months" because plaintiff "began the [interactive] process via email on July 20, 2016, and the [a]dministration had purchased four new videophones by September 8, 2016." Defs.' Mot. at 8–9. But that misses the point. Plaintiff never got to use the videophone after he received it because, despite his requests to the agency, it was not installed by the time he was terminated. Defendants have provided no reason or highlighted anything in the record explaining why the videophone was

not installed, whether it was simply delayed or otherwise, and so the undisputed facts show that the agency failed to make the videophone available for plaintiff's use.

Because there is no actual dispute over a material fact on this count and plaintiff has sustained his burden of evidence, the Court will grant him summary judgment on the failure to accommodate claim based on the agency's failure to accommodate him with the videophone.

III.    **The Court will grant summary judgment in favor of defendants on the hostile work environment claims under Counts Three and Four because plaintiff has not come forward with sufficient facts to show severe and pervasive conduct necessary for the claims.**

To prevail on a hostile work environment claim, "a plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hill*, 897 F.3d at 237, quoting *Baloch*, 550 F.3d at 1201 (internal quotation marks omitted). The environment "must be both objectively and subjectively hostile, meaning that a reasonable person would find it hostile or abusive, and that the victim must subjectively perceive the environment to be abusive." *Id.*, quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) (quotation marks and alterations omitted). And the "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*, quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation marks omitted).

In support of his claims, plaintiff points to several allegations in his complaint that, "[v]iewed in a light most favorable to [plaintiff], . . . indicate that [he] was subjected to constant harassment that was sufficiently severe and pervasive":

> [O]n July 23, 2016, his Reasonable Accommodation request to order new videophone equipment was denied; on August 11, 2016, August 24, 2016, August 29, 2016, September 8, 2016, and October 27, 2016, Grindstaff's work equipment was not fixed; on October 17, 2016, management refused to accept Grindstaff's three leave slips for October 3, 4, and 11, 2016; on

23

October 19, 2016, Grindstaff's request for an interpreter was ignored; on October 19, 2016, Grindstaff's request for administrative leave was denied; on October 27, 2016, Grindstaff was told that his request(s) for Reasonable Accommodation resulted in people not liking him; on October 27, 2016, management made a final decision to charge Grindstaff with Absent Without Official Leave; on November 18, 2016, Grindstaff was issued a Notice of Termination for Unacceptable Conduct; management refused to promote him to a GS-9; and management terminated his employment.

Pl.'s Cross-Mot. at 33–34, citing Compl. ¶ 42.[3]  In short, plaintiff amasses all of his allegations of failure to accommodate or disparate treatment and alleges that they add up to hostile work environment.  But at this point, he must "designate specific facts" in the record "showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).

Plaintiff primarily relies on Samuels's declaration that, "Mr. Dixel told Mr. Grindstaff that his requests for reasonable accommodation 'resulted in people not liking him.'"  Samuels Decl. ¶ 50.  Although such a comment is frustrating and hurtful, "isolated expression[s] of frustration" generally do not "rise to the level of severity indicating hostility or abuse." *Brooks v. Grundmann*, 748 F.3d 1273, 1277 (D.C. Cir. 2014); *see Faragher*, 524 U.S. at 788  (explaining that "simple teasing" or "offhand comments" do not rise to the level of a hostile work environment).  And the Court cannot say that the singular comment from Dixel was extreme enough to amount to a change in the terms and conditions of plaintiff's employment.

Plaintiff also points to his assertions that Dixel "ignored [his] requests for accommodation, refused to meet with him, refused to fix [his] office equipment, refused to provide replacement equipment, . . . refused to even look for a replacement interpreter when Samuels was out on leave," "marked [him] AWOL when he was on pre-approved leave," and "terminated [him] for going to

---

3       Although plaintiff alleged two separate hostile work environment claims, one based on disability discrimination and one based on retaliatory harassment, his motion argues that both are supported by the same set of facts. *Compare* Compl. ¶¶ 49–52, *with* Pl.'s Cross-Mot. at 32–35.

the gym." Pl.'s Cross-Mot. at 34–35, citing Grindstaff Aff. ¶¶ 30, 38–40. But "a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard." *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

Because there is no genuine issue of material fact as to either of plaintiff's hostile work environment claims, the Court will grant defendants summary judgment on Counts Three and Four.

**IV.    The Court will grant summary judgment in favor of defendants on the retaliation claim under Count Five because plaintiff has not put forth evidence to create a genuine dispute as to the cause of the agency's decision to terminate him.**

Finally, defendants move for summary judgment on plaintiff's claim that the agency retaliated against him by terminating him for requesting reasonable accommodations and participating in the Equal Employment Opportunity complaint process. Defs.' Mot. at 11; Compl. ¶¶ 53–54.

In the absence of direct evidence, a plaintiff must prove a retaliation claim by establishing that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by the employers; and (3) the protected activity was the but-for cause of the alleged adverse action.

*Solomon*, 763 F.3d at 14; *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).[4]  The *McDonnell Douglas* burden-shifting framework applies to a retaliation claim based on circumstantial evidence, *Solomon*, 763 F.3d at 14, in which the plaintiff must first show a prima facie case of retaliation, the defendant must then articulate some legitimate reason for the adverse action, and plaintiff must then prove that the offered reason is pretext for retaliation.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  But when the employer comes "forward with a legitimate, non-retaliatory justification for [the defendant's] actions," the burden-shifting framework falls away, and "the only question is whether [plaintiff's] evidence creates a material dispute on the ultimate issue of retaliation."  *Doak*, 798 F.3d at 1107, quoting *Solomon*, 763 F.3d at 14 (internal quotation marks omitted).

Here, defendants have come forward with a legitimate, non-retaliatory reason for terminating plaintiff: "his excessive absenteeism and failure to adequately explain the cause of his absences."  Defs.' Mot. at 11.  It is undisputed that plaintiff left work during duty hours on October 3, 2016, to go to the gym, DSUMF ¶ 40; PODSUMF ¶ 40, and that he was absent from work on October 4 and October 11.  DSUMF ¶¶ 45–54, 55–60; PODSUMF ¶¶ 45–54, 55–60.  It is

---

4       The D.C. Circuit has not yet applied the but-for causation standard set forth in *University of Texas*, a case concerning retaliation under Title VII, to a claim under the Rehabilitation Act.  But "the Rehabilitation Act incorporates [the Americans with Disabilities Act] § 107, which in turn incorporates '[t]he powers, remedies, and procedures'" set forth under Title VII.  *Woodruff*, 482 F.3d at 528–29, quoting 42 U.S.C. § 12117.  And much of the reasoning in *University of Texas* that led the Court to assign the but-for standard to Title VII applies to the Rehabilitation Act.  For example, the Court looked to Title VII's text that, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made . . . unlawful . . .," and it explained that the use of "because" meant that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas*, 570 U.S. at 351–52.  The Rehabilitation Act's cause of action for retaliation comes from the ADA, which similarly states, "No person shall discriminate against any individual *because* such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a) (emphasis added).

undisputed that Dixel gave plaintiff an opportunity to explain all three incidents through a written questionnaire, DSUMF ¶ 61; PODSUMF ¶ 61, and the questionnaire did not provide explanations for his absences. Grindstaff Questionnaire at 1–3. Finally, it is undisputed that the agency formally charged plaintiff with fourteen-and-a-half hours of AWOL time, and then cited the absenteeism and his failure to respond adequately to Dixel's questionnaire as the reasons for termination. DSUMF ¶¶ 74–75; PODSUMF ¶¶ 74–75; *see* Termination Letter at 1 ("Your conduct has been unsatisfactory because you failed to follow my instructions, you accrued 14.5 hours of Absence without Leave . . . , and you provided untimely, incomplete, and inappropriate responses to my written questions.").

Given defendants' justification, the burden shifts back to plaintiff to point to facts in the record that raise a genuine dispute concerning the agency's motivation for terminating plaintiff and whether retaliation was the but-for cause.

Plaintiff attempts to show that his protected activity was the cause of his termination by attacking each of defendants' rationales for terminating him. Pl.'s Cross-Mot. at 39–41. He asserts that the termination could not have been based on his absenteeism because his two absences on October 4 and 11 were actually "pre-approved by Dixel." *Id.* at 40; Pl.'s Reply at 13. He cites to a paragraph of his affidavit stating that, "I was terminated for taking leave that was pre-approved and for going to the gym," Grindstaff Aff. ¶ 38, and a paragraph of Samuels's declaration stating, "I became aware that on October 17, 2016, Mr. Dixel refused to accept Mr. Grindstaff's three leave slips for October 3, 4, and 11, 2016, even though the leave was pre-approved." Samuels Decl. ¶ 48. But these statements do not defeat summary judgment. At this point in litigation, plaintiff must point to facts in the record that create a question for the jury as to whether the agency's

27

reasoning was pretextual, and the vague and conclusory statements that plaintiff was "pre-approved" for leave, which have no factual support in the record, are not enough.

Plaintiff further asserts that the agency could not have fired him for failing to fill out the questionnaire because he did in fact answer the questions. But the agency did not say that it was firing him because he did not answer the questions; it stated that he "provided untimely, incomplete, and inappropriate responses" to the questionnaire. Termination Letter at 1. And the questionnaire in the record supports that reasoning:

> Q. In 2016, how often have you gone to the gym or engaged in physical activity during duty hours?
>
> A. n/a
>
> * * *
>
> Q. Did you believe that you were permitted to exercise for an hour each day during duty time?
>
> A. Yes.
>
> Q. If so, why? Explain specifically and fully including what written or oral information you received and the source.
>
> A. Talk to Eugene.
>
> * * *
>
> Q. On Tuesday, October 4, your telework day you missed meetings and had a sudden departure. You wrote to me: *Please cancel my appointment this afternoon. Something just came up recently that need my urgent attention. So I will need to leave at 11 am. Please use my leave slip for this afternoon. As your request to be offline during the leave. So I will be offline until next week.*
>
> What "came up" that required your urgent attention on that day?
>
> A. My friend needed my urgent help.
>
> * * *

28

Q. On the morning of October 4, did you have travel arrangements that you had to change because of a conflict with our first meeting?

A. n/a

\* \* \*

Q. On Tuesday, October 11, your telework day I tried to contact you and set up two video calls and also contacted you via email and received no response. Did you work that day? [A]nd if so please provide me with evidence that you did so.

A. Please check your email on 10/10/2016.

Grindstaff Questionnaire at USA-GRINDSTAFF-00390–91. If the answers on the questionnaire had any substance to them, there could be a triable issue as to whether the agency's reasoning related to the questionnaire was pretextual, but the record itself does not support that argument.

Finally, plaintiff reasserts his argument that the agency's reasoning related to the gym absence was pretextual because other employees went to the gym during work hours without punishment. Pl.'s Cross-Mot. at 39–40. While the Court has already found that the discrimination claim in Count One will move forward on this basis, these facts do not create a genuine dispute of fact as to whether retaliation for protected activity was the but-for cause of his termination. The record reflects that the agency had multiple legitimate reasons for terminating plaintiff that included not only the October 3 absences, but also his lackluster explanation of all of the absences, including absences unrelated to the use of the gym. Therefore, the Court will grant summary judgment to defendants on the retaliation claim because plaintiff has failed to identify disputed facts that would enable a juror to find that he has established the element of causation.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment [Dkt. # 25] is **GRANTED IN PART AND DENIED IN PART**. The Court enters summary judgment in favor of defendants on Counts Three, Four, and Five, and it denies the motion as to Counts One and

Two.  Plaintiff's cross-motion for summary judgment [Dkt. # 28] is **GRANTED IN PART AND DENIED IN PART**.  The Court enters summary judgment in favor of plaintiff on Count Two, and it denies the motion as to Counts Three, Four, and Five.  This leaves Count One, which will move forward on the claim that disciplining plaintiff for using the gym during work hours was discriminatory.  And the question of what damages, if any, are due for the failure to provide the reasonable accommodation of a videophone remains to be resolved.

      **SO ORDERED.**

 

_____
AMY BERMAN JACKSON
United States District Judge

DATE:  March 27, 2026